UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE CASTILLO

MAGISTRATE JUDGE BOBRICK

UNITED STATES OF AMERICA )
)   No.
vs. )
)
LABS OF VIRGINIA, INC., )
DAVID M. TAUB, )
CHARLES J. STERN, and )
WILLIAM CURTIS HENLEY III )
)
)
)
)
)
)

**02CR0312**

DOCKETED
APR 0 3 2002

Violations: Title 16,
United States Code,
Sections 3372(a)(2)(A),
3372(d), 3373(d)(2),
and 3373(d)(3)(A)(i);
Title 18, United States
Code, Section 545, Title
50, Code of Federal
Regulations, Section
14.105(b)(2).

**FILED**

APR 0 2 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COUNTS ONE THROUGH FOUR
### (THE FALSE RECORDS CHARGES)

The SPECIAL JULY 2000-2 GRAND JURY charges:

1. Defendant LABS OF VIRGINIA, INC. ("LABS"), a Virginia
corporation, was engaged in the business of, among other things,
breeding and selling non-human primates for use in medical
research. LABS imported non-human primates for this purpose. One
type of non-human primate which LABS imported for these purposes is
known by the scientific name "Cynomolgolus macaques" (*Macaca
fascicularis*) and by the common name "crab-eating macaques." LABS
had a non-human primate breeding and storage facility located in
Yemassee, South Carolina.

2. Defendant DAVID M. TAUB was LABS's President and Chief
Operating Officer.

3. The Bionetics Corporation ("Bionetics") purchased the
entity which became LABS from defendant TAUB in approximately May
1996. Bionetics had places of business in Hampton, Virginia and

Newport News, Virginia. TAUB remained at LABS after the sale to Bionetics.

4. Defendant CHARLES J. STERN was LABS's Chairman of the Board. STERN had an ownership interest in Bionetics. STERN served as Bionetics's President and/or Chief Executive Officer.

5. Defendant WILLIAM CURTIS HENLEY III was on LABS's Board of Directors. HENLEY was also Bionetics's Chief Financial Officer and/or Treasurer.

6. Indonesian Aquatics Export CV ("Inquatex") was a company located in Indonesia which was owned by Person A and which was engaged in the business of capturing, breeding and exporting non-human primates including crab-eating macaques.

**Import and Export Treaties, Statutes and Regulations**

7. The United States and Indonesia, among many other countries, are parties or signatories to an international treaty known as the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). CITES was enacted in order to protect, among other things, certain species of wildlife against over-exploitation. Species are designated under CITES according to a classification system known as "Appendices." Appendix II to CITES includes wildlife species which, although not necessarily threatened at the present time, may become threatened if trade in those species is not strictly limited. Thus, in an effort to monitor and to control the trade of Appendix II species,

CITES requires that a party to the treaty such as the United States only import species included in Appendix II that are accompanied by a valid foreign export permit (a "CITES" permit) from the species' country of origin or from the country from which the species were exported.

8.   Crab-eating macaques have been designated as an Appendix II species under CITES since 1977.

9.   The United States Fish and Wildlife Service ("USFWS") is designated by Congress as the authority within the United States which enforces CITES. The USFWS issues regulations to enforce the various wildlife protection provisions of CITES and to provide safeguards for the importation of wildlife into the United States. All persons, including corporations, involved in importing wildlife into the United States are required to adhere to these regulations.

10.  All wildlife imported into the United States, including species included in Appendix II to CITES, must first be presented to the USFWS and the United States Customs Service for inspection. Certain documents must also accompany and be presented with each shipment. These documents include all permits and licenses required by the laws and regulations of the United States and all export-related permits required by the laws and regulations of any foreign country.

11.  Shipments containing species included in Appendix II to CITES must be accompanied by a valid CITES permit.  A CITES permit is valid only for the animals described in the permit.

12.  The Lacey Act, Title 16, United States Code, Section 3371 et seq., among other statutes, governs the importation of species included in Appendix II of CITES into the United States.  Section 3372(d) of the Lacey Act provides in pertinent part that "[i]t is unlawful for any person to make or submit any false record, account, label for, or any false identification of, any . . . wildlife . . . which has been . . . imported, exported, transported, sold, purchased, or received from any foreign country; or . . . transported in interstate or foreign commerce."

13.  The term "person," as used in the Lacey Act, includes corporations.

14.  The "records" to which Section 3372 refers includes, among other documents, CITES permits and health certificates, and the labels or identifications contained therein.

15.  A country which is a party or signatory to CITES may also enact its own laws governing the trade in its wildlife in order to protect native-born species.  These foreign laws may impose more restrictive conditions on the trade of CITES Appendix II species than CITES itself.  Since 1994, for example, Indonesia has banned the export of wild-caught crab-eating macaques.  This ban on exporting wild-caught crab-eating macaques is set forth in a law

4

titled The Decree of the Minister of Forestry No. 26/Kpts-11/94 ("Decree No. 26/Kpts-11/94"). Decree No. 26/Kpts-11/94 also governs those crab-eating macaques which were caught in the wild but which were kept in captivity after their capture. The decree does not apply to "captive-bred" crab-eating macaques, that is, crab-eating macaques which are bred (conceived), born and raised in captivity.

16. One of the columns on a CITES permit is labeled "Appendices (source)." A CITES permit which contains the designation "II" in this column reflects a reference to CITES Appendix II. A CITES permit which contains the designation "C" in this column, as the designation "C" is defined under CITES, means that the animals to which the CITES permit applies were bred in captivity.

**Labs' Purchase of the Inquatex Crab-Eating Macaque Colony**

17. In approximately May 1996, defendant LABS, through one of its employees ("Person B"), learned that Inquatex was offering for sale a "breeding" colony of crab-eating macaques (the "Inquatex colony"). A breeding colony contains adult male non-human primates and productive adult female non-human primates and is valuable because, based on this population mix, the colony is capable of regenerating itself. A breeding colony can provide a firm such as LABS with a steady supply of non-human primates to sell to medical research firms and institutions. LABS, through defendants TAUB,

5

STERN and HENLEY, began negotiations to purchase the Inquatex breeding colony from Person A.

18. In approximately June 1996, Person B traveled to Indonesia and inspected the Inquatex colony. On or about July 1, 1996, while Person B was still in Indonesia, Person B sent to defendant TAUB information about the Inquatex colony. Person B informed TAUB that Inquatex began to form the colony in July 1991 and that the non-human primates had been "trapped in the wild" and then transported to the Inquatex facility. Person B also informed TAUB that the colony contained a total of 1,397 non-human primates of which 533 were "parents."

19. On or about July 11, 1996, Person B, who had returned to the United States, distributed a memorandum to defendants TAUB, STERN and HENLEY about the Inquatex colony. Person B stated in the memorandum, among other things, that since exporting wild-caught crab-eating macaques was against Indonesian law unless some exception was written, Person A had gone to the Indonesian government and had cut a "baksheesh" deal to pay them off. Baksheesh means "bribe." Person B also stated that Inquatex's monthly expenses included $300 in "CITES charity" that needed to be paid out to various officials.

20. Person B included with his memorandum an Inquatex-prepared document called "Captive Breeding of Long-Tailed Macaque (Macaca fascicularis) in C.V. Inquatex - Primate Division"

6

("Inquatex brochure").  The Inquatex brochure stated that, as of October 1993, Inquatex had 668 heads of "conditional macaque (the ones from the wild)" and 762 heads of "breed" macaques.

21.  In approximately late July 1996, after Person A visited defendant LABS' facility, LABS and Person A, through their respective representatives, began to prepare a Purchase Agreement for the Inquatex colony.  Defendant TAUB and Person A also began to arrange for the first shipment of crab-eating macaques from the Inquatex colony.

22.  On or about October 4, 1996, Person B sent defendants TAUB, STERN and HENLEY a memorandum in which Person B described a source other than the Inquatex colony by which to obtain crab-eating macaques.  Person B informed TAUB, STERN and HENLEY that, in contrast to the Inquatex colony, the alternative source allowed them to "follow[] the spirit of CITES, i.e., we are only exporting purpose bred animals, not wild caught. . . ."

23.  On or about January 31, 1997, the formal Purchase Agreement act for the purchase of the Inquatex colony was signed. The Purchase Agreement described the Inquatex colony as containing approximately 1,312 crab-eating macaques.  The Purchase Agreement stated in part that each party was to provide the other with all applications and other documents filed as a part of the CITES permit process.  The Purchase Agreement also required LABS to pay

7

Inquatex a monthly fee for the maintenance of the Inquatex colony.

**The O'Hare Shipments**

24.   The Inquatex colony was transported from Indonesia to defendant LABS in the United States in seven separate shipments between on or about February 20, 1997 and on or about October 13, 1998.   The first four shipments entered the United States through O'Hare International Airport ("O'Hare") in Chicago, Illinois. These four shipments arrived at O'Hare on or about the following dates: (a) February 20, 1997; (b) April 10, 1997; (c) May 1, 1997; and (d) May 30, 1997.

25.   An employee of defendant LABS was present at the Inquatex facility in Indonesia prior to each shipment.  These LABS employees monitored the selection and preparation of the crab-eating macaques in the Inquatex colony for shipment to the United States.  The LABS employees communicated with defendant TAUB at the LABS facility in the United States during the course of their stay.

26.   The four O'Hare shipments contained a mix of wild-caught and captive-bred crab-eating macaques.  The CITES permits for each shipment, however, falsely represented that the shipments contained only captive-bred crab-eating macaques.

**The February 20, 1997 Shipment**

27.   On or about February 7, 1997, Person A sent defendant TAUB four separate CITES permits dated February 5, 1997 for the 220 crab-eating macaques in the first shipment.   Each CITES permit

8

authorized the export of 55 "crab-eating monkeys" and each described the contents of the shipment as "[c]aptive-bred specimens, no quota is allocated." Each permit contained the notation "II(C)" in the column marked "Appendices (source)."

28. The "Health Certificate" dated February 18, 1997 which defendant LABS submitted as a part of the first shipment represented that the 220 crab-eating macaques in the shipment had been "[c]aptive bred born at INQUATEX, facilities (Jakarta/ Indonesia).

**The April 10, 1997 Shipment**

29. On or about April 7, 1997, Person A sent defendant TAUB a copy of the CITES permit dated March 10, 1997 for the second shipment of crab-eating macaques. The CITES permit authorized the export of 255 "[c]rab-eating [m]acaque" which it described as "[c]aptive breed specimen, no quota allocated." The permit contained the notation "II(C)" in the column marked "Appendices (source)."

30. The second shipment consisted of approximately 253 crab-eating macaques from the Inquatex colony. Approximately 98 of these crab-eating macaques were wild-caught.

31. The "Health Certificate" dated April 8, 1997 which defendant LABS submitted as a part of the second shipment represented that the 253 crab-eating macaques in the shipment had

been "[c]aptive bred born at INQUATEX, facilities (Jakarta/ Indonesia)."

### The May 1, 1997 Shipment

32. On or about April 16, 1997, Person A sent defendant TAUB the CITES permit dated April 14, 1997 for the third shipment. The CITES permit authorized the export of 120 "[c]rab-eating [m]acaque" which it described as "[c]aptive breed specimen, no quota allocated." The permit contained the notation "II(C)" in the column marked "Appendices (source)."

33. The third shipment consisted of approximately 120 crab-eating macaques from the Inquatex colony. Approximately 50 of these crab-eating macaques were wild-caught.

34. The "Health Certificate" dated April 23, 1997 which defendant LABS submitted as a part of the third shipment represented that the 120 crab-eating macaques in the shipment had been "[c]aptive bred born at INQUATEX, facilities (Jakarta/ Indonesia).

### The May 30, 1997 Shipment

35. On or about May 9, 1997, Person A sent to defendant TAUB the CITES permit dated April 14, 1997 for the fourth shipment. The CITES permit authorized the export of 255 "[c]rab-eating [m]acaque" which it described as "[c]aptive breed specimen, no quota allocated." The permit contained the notation "II(C)" in the column marked "Appendices (source)."

10

36. The fourth shipment consisted of approximately 253 crab-eating macaques from the Inquatex colony. Approximately 99 of these crab-eating macaques were wild-caught.

37. The "Health Certificate" dated May 27, 1997 which defendant LABS submitted as a part of the fourth shipment represented that the 253 crab-eating macaques in the shipment had been "[c]aptive bred born at INQUATEX, facilities (Jakarta/Indonesia).

38. On or the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division,

LABS OF VIRGINIA, INC., and
DAVID M. TAUB,

defendants herein, did knowingly submit a false record, account, label for, and a false identification of wildlife, namely, CITES permits and health certificates for shipments described below containing wild-caught and captive-bred *Macaca fascicularis* which falsely represented that the shipments contained only captive bred *Macaca fascicularis*, which wildlife had been imported from a foreign country, namely, Indonesia, and transported in foreign commerce:

11

| Count | Arrival Date at O'Hare | Total No. in Shipment | Approx. No. Wild-Caught |
|-------|------------------------|------------------------|--------------------------|
| One   | 02/20/97               | 220                    | 80                       |
| Two   | 04/10/97               | 253                    | 98                       |
| Three | 05/01/97               | 120                    | 50                       |
| Four  | 05/30/97               | 253                    | 99                       |

All done in violation of Title 16, United States Code, Sections 3372(d) and 3373(d)(3)(A)(i).

## COUNT FIVE
### (THE TRAFFICKING CHARGE)

The SPECIAL JULY 2002-2 GRAND JURY further charges:

1.  The allegations contained in Paragraphs 1 through 37 of Count One are incorporated as if set forth herein.

2.  The Lacey Act, Title 16, United States Code, Section 3372(a)(2)(A), provides in pertinent part that "[i]t is unlawful for any person . . . to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce . . . any . . . wildlife . . . transported, or sold . . . in violation of any foreign law. . . ." Indonesian Decree No. 26.Kpts-11/94 is a foreign law which is encompassed within Section 3372(a)(2)(A) of the Lacey Act.

3.  The four shipments from Inquatex which entered the United States through O'Hare contained productive wild-caught crab-eating macaques.

4.  Between on or about February 20, 1997 and on or about May 30, 1997, at Chicago, in the Northern District of Illinois, Eastern Division,

> LABS OF VIRGINIA, INC.,
> DAVID M. TAUB,
> CHARLES J. STERN, and
> WILLIAM CURTIS HENLEY III,

defendants herein, did knowingly import wildlife in interstate and foreign commerce, namely, wild-caught *Macaca fascicularis,* and in the exercise of due care should have known that the wildlife was

13

transported and sold in violation of a foreign law, namely, Decree No. 26/Kpts-11/94, which imposed a ban on the transportation from Indonesia, that is, the export of wild-caught *Macaca fascicularis*;

In violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(2).

## COUNTS SIX THROUGH NINE
### (THE IMPORTATION IN VIOLATION OF LAW CHARGES)

The SPECIAL JULY 2002-2 GRAND JURY further charges:

1.    The allegations contained in Paragraphs 1 through 37 of Count One are incorporated as if set forth herein.

2.    On or about the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division,

LABS OF VIRGINIA, INC., and
DAVID M. TAUB,

defendants herein, did fraudulently and knowingly import into the United States certain merchandise contrary to law in the shipments described below, namely, wild-caught *Macaca fascicularis,* knowing the merchandise to have been imported into the United States contrary to law;

| Count | Arrival Date at O'Hare | Total No. in Shipment | Approx. No. Wild-Caught |
|-------|------------|------------|------------|
| Six | 02/20/97 | 220 | 80 |
| Seven | 04/10/97 | 253 | 98 |
| Eight | 05/01/97 | 120 | 50 |
| Nine | 05/30/97 | 253 | 99 |

All in violation of Title 18, United States Code, Section 545.

15

## COUNTS TEN THROUGH TWELVE
### (THE HUMANE TRANSPORT CHARGES)

The SPECIAL JULY 2002-2 GRAND JURY further charges:

1.  The allegations contained in Paragraphs 1 through 37 of Count One are incorporated as if set forth herein.

2.  Defendant LABS, through defendant TAUB, applied for and was issued by USFWS a Federal Fish and Wildlife Import/Export Permit which was effective between May 1, 1996 and May 31, 1997. The Import/Export Permit stated in pertinent part that its validity was "conditioned upon strict observance of all applicable foreign, state, local or other federal law."

3.  The federal regulations issued by USFWS which govern the humane and healthful transport of wildlife to the United States are set forth at Title 50, Code of Federal Regulations, Section 14.105. Section 14.105 provides in pertinent part that "[a] nursing mother with young . . . shall be transported only if the primary purpose is for needed medical treatment and upon certification in writing by the examining veterinarian that the treatment is necessary and the animal is able to withstand the normal rigors of transport. . . ."

4.  On or about April 7, 1997, defendant TAUB instructed the employee of defendant LABS at the Inquatex facility for the second O'Hare shipment to include "mothers with unweaned infants greater than 2 months of age" in the shipment.

16

5.   On or about April 18, 1997, Person A informed an employee of defendant LABS that the third O'Hare shipment would include "17 mother with baby."

8.   On or about May 26, 1997, Person A sent to an employee of defendant LABS a listing of the crab-eating macaques to be included in the fourth O'Hare shipment.   The list reflected that the shipment would contain "19 HDS [heads] BABY AND MOTHER."

9.   On or the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division,

                    LABS OF VIRGINIA, INC., and
                    DAVID M. TAUB,

defendants herein, did knowingly import wildlife in interstate and foreign commerce in the shipments described below, namely, *Macaca fascicularis* which included nursing mothers with young when the primary purpose of their transport was not needed medical treatment, and in the exercise of due care should have known that the wildlife was transported to the United States in violation of a regulation of the United States, namely, Title 50, Code of Federal Regulations, Section 14.105(b)(2):

| Count | Arrival Date | Total No. in Shipment | Approx. No. Pairs Nursing Mothers & Unweaned Young |
|---|---|---|---|
| Ten | 04/10/97 | 253 | 20 |
| Eleven | 05/01/97 | 120 | 17 |
| Twelve | 05/30/97 | 253 | 19 |

17

All done in violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(2).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

18

No.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

vs.

LABS OF VIRGINIA, INC.,
DAVID M. TAUB,
CHARLES J. STERN, and
WILLIAM CURTIS HENLEY III

I N D I C T M E N T

Violations:    Title 16, USC, Sections
3372(a)(2)(A), 3372(d),
3373(d)(2), and
3373(d)(3)(A)(i); Title 50,
Code of Federal Regulations,
Section 14.105(b)(2), and
Title 18 USC Section 545

A true bill,

_____
Foreman

Filed in open court this ___2___ day of ___April___ A.D. 20_2_

_____
Clerk

Bail, $ _____

PO 880.320